# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

LISA Y. CHAVEZ,

        Plaintiff,

vs.                                 No.  01cv1146 JHG

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's (Chavez') Motion to Reverse and Remand for a Rehearing, filed June19, 2002.  The Commissioner of Social Security issued a final decision denying Chavez' application for disability insurance benefits and supplemental security income. Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to remand is well taken and will be GRANTED.

## I.  Factual and Procedural Background

Chavez, now thirty-six years old, filed her application for disability insurance benefits on January 25, 2000, and an application for supplemental security income on December 7, 1999, alleging disability since December 31, 1998, due to Klippel-Feil Syndrome and depression. Chavez has a high school education, over 100 college credits and lacks one course to complete her associate degree.  Chavez has past relevant work as an inventory auditor, telemarketer, and security guard.  On April 26, 2001, the Commissioner's Administrative Law Judge (ALJ) denied

benefits, finding that Chavez' impairments were severe but did not singly or in combination meet or equal in severity any of the disorders described in the Listing of Impairments, Subpart P, Appendix 1.  The ALJ further found Chavez  retained the residual functional capacity (RFC) for a wide range of light work with no overhead reaching or working at unprotected heights.  Tr. 13. Additionally, relying on the agency's consultative psychiatrist's evaluation, the ALJ further limited Chavez to simple repetitive work in a low stress environment.  *Id.*  As to her credibility, the ALJ found Chavez' testimony was generally credible but found her perceived limitations were not fully substantiated by the medical evidence.  *Id.*  Chavez filed a Request for Review of the decision by the Appeals Council.  On August 1, 2001, the Appeals Council denied Chavez's request for review of the ALJ's decision.  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes.  Chavez seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence

2

of record must be considered in making those findings, *see Barker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity.  *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled.  *Thompson v. Sullivan*,  987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20

3

C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20

C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to

the Commissioner to show the claimant is able to perform other substantial gainful activity

considering her residual functional capacity, age, education, and prior work experience. *Id.*

      In support of her motion to reverse, Chavez makes the following arguments: (1)  the

ALJ's finding that she retained the RFC to perform light work is unsupported by substantial

evidence and is contrary to law; and (2) the ALJ improperly evaluated her mental impairment.

**<u>Medical Record</u>**

      The record reflects the following:

      On May 28, 1998, Dr. Dean Smith from the Department of Orthopaedics & Rehabilitation

at University Hospital evaluated Chavez.  Tr. 165, 166.  Chavez was concerned with her

appearance and denied any numbness, tingling, weakness or paresthesias into any of her

extremities.  On physical examination, Dr. Smith found Chavez had a left thoracic hump, her left

shoulder was slightly higher than her right, and her head appeared slightly offset.  However, Dr.

Smith found Chavez was nontender over her spine and had a normal gait.  Dr. Smith obtained

scoliosis films and compared them to films from 1997.  Tr. 167.  A review of Chavez' x-rays

indicated fusion of her cervical spine and no change in her left thoracic curve.  Dr. Smith

recommended Chavez "do nothing at this point."  Tr. 166.

      On September 24, 1998, Chavez consulted with Dr. Fredrick C. Sherman, a physician with

New Mexico Orthopaedic Associates, regarding her neck pain.  Tr. 124.  Chavez had concerns

about her appearance and requested Dr. Fredrick "give her a longer neck and move her scapula or

shoulder into a different position."  *Id.*  Chavez stated she was having pain in the posterior portion

of her neck, worse on the left side.   Chavez also expressed that she felt her neck had become

shorter and stiffer.  Chavez also complained of depression.  Chavez was not taking any

medications at this time.  The physical examination indicated Chavez had a limited range of

motion of her cervical spine and had pain with hyperextension and lateral rotation bilaterally.  Dr.

Sherman ordered a CT scan of the cervical occipital junction to rule out spinal cord impingement.

On September 30, 1998, Chavez had a CT scan of the cervical spine to rule out spinal

cord impingement and a possible craniocervical instability.  Tr. 122.  The CT scan report

indicated:

> The patient, as seen on plain films, is fused throughout the cervical area in the
> anterior column.  C1 is not clearly seen and appears either hypoplastic or
> incorporated in the skull base.  The patient has hypoplasia of the posterior
> elements at C2 to C4 with the spinal canal being widely patent with no evidence of
> significant canal narrowing either with flexion or extension.  Between neutral and
> flexion, the basion of the skull base which contacts the hypoplastic odontoid
> process shows no significant change in position.  With extension, there is mild
> distraction of basion and odontoid (about 5-6 mm).  Incidental note is made of
> somewhat atrophic spinal cord with somewhat flattened configuration in AP
> direction compared to expected.  No other obvious cord abnormalities are seen in
> this patient, who apparently has only minimal hyperreflexia in the extremities with
> otherwise good trunk and extremity neuromuscular function.
>
> Impression:  No evidence of significant craniocervical instability in this patient with
> Klippel-Feil abnormality.  No evidence of focal craniocervical stenosis is seen
> either with flexion or extension.  Mildly abnormal-appearing cord noted, as
> discussed above.  However, the patient does not have any significant abnormalities
> in the trunk or extremities according to Dr. Sherman, therefore, it is not thought
> necessary at this time to suggest MRI for further evaluation of the cord.

Tr. 123.

On October 20, 1998, Chavez was seen at University Hospital.  Tr. 164.  Dr. Mark

Crawford had referred her for an evaluation.  Chavez reported diffuse pain above the shoulders

5

that started around July of 1998.  The physician noted decreased range of motion of the cervical spine and decreased neck length.  However, the physician's examination revealed  a nontender cervical spine. The physician ordered x-rays and an MRI of the cervical spine, recommended neck exercises, and instructed Chavez to return for a follow-up.  The MRI indicated she had a near complete fusion of the cervical spine.  Tr. 162-63.

On November 17, 1998, Chavez returned to University Hospital for a follow-up.  Tr. 161. Chavez complained of neck pain.  Chavez reported hot and cold packs along with exercise helped relieve her pain.  Chavez also reported Flexeril (muscle relaxant) made her sleepy but relieved her pain.  However, Chavez reported only taking the Flexeril once every three days.  Chavez also claimed she did not do the neck exercises because she did not agree with the need for them.  On physical examination, the physician noted a shortened neck, decreased range of motion of the cervical spine, tense trapezius muscles and nontender cervical spine.  The physician directed Chavez to start doing her neck exercises to strengthen her neck muscles and continue the Flexeril. Chavez was to return in two months.

On June 1, 1999, Chavez returned to University Hospital for a follow-up.  Tr. 160. Chavez reported not doing her neck exercises because she "disagreed" with them.  The physician reported "severely tight neck muscles" and recommended Chavez do neck exercises, continue on Flexeril, referred her to the pain clinic and ordered x-rays of the cervical spine.

On November 2, 1999, Chavez returned to University Hospital requesting a prescription refill for Flexeril.  Tr. 158.  The physician noted a mild scoliosis and ordered an x-ray of the chest to further evaluate the problem.  The physician also referred Chavez to physical therapy to improve strength and flexibility of the neck and shoulder girdle.  Tr. 159.

On November 23, 1999, Chavez was seen at the Neurosugery Clinic for neck pain.  Tr. 157.  On physical examination the physician noted "nontender neck."  The physician ordered an MRI of the brain.

On February 1, 2000, Chavez returned to University Hospital for a follow-up with Dr. Michael Schneier.  Tr. 156. Chavez returned for the results of her MRI of the head and also discussed her disability claim.  On physical examination, Dr. Schneier found a shortened neck, mild scoliosis, and a left raised scapula.  Dr. Schneier reported the MRI revealed no significant changes.  Dr. Schneier referred Chavez to Dr. Paradez for her disability claim and instructed her to return to the Neurosurgery Clinic on a p.r.n. (as needed) basis.

On February 11, 2000, Chavez went to University Hospital Emergency Center with complaints of anxiety and depression.  Tr. 128.  Chavez complained of being tense and having difficulty breathing but denied chest pain or palpitations.  The emergency room physician prescribed hydroxyzine hydrochloride for anxiety and advised her to make an appointment with the mental health clinic.

On March 21, 2000, Dr. Paradez examined Chavez at University Hospital.  The neurology department at University Hospital referred Chavez for an initial visit with a primary care physician in order to assist her with her disability claim.  Tr. 150-152.  Chavez had not previously seen a primary care physician and had been receiving her health care from the neurology department for 1 ½ years.

Dr. Paradez' physical examination revealed a dysmorphic appearance to her facies, a very low hairline on her neck, a webbed neck and short stature.  Tr. 150.  Dr. Paradez also noted Chavez had (1) limited rotation of her neck about her axial skeleton without tenderness and no

7

point tenderness within the axial skeleton; (2) TMJ joints were within normal limits; (3) arms and shoulders had normal range of motion and normal strength as well as sensation; and (4) lower extremity strength was normal.  Chavez' EKG was essentially normal.  Significantly, Dr. Paradez consulted with a case manager regarding her disability evaluation but did not comment on whether he believed Chavez was disabled.  Dr. Paradez discussed Chavez with Dr. Julie Broyles. Tr. 151.  Dr. Paradez instructed Chavez to return in two months.

On March 21, 2000, Ms. Jeanine Sukis, R.N., the case manager, evaluated Chavez' financial and disability issues.  Tr. 153-54.  Ms. Sukis noted Dr. Paradez did not feel he could provide a statement of disability since he had only seen Chavez once.  However, Chavez' ISD caseworker informed Ms. Sukis that Chavez needed a statement from a physician stating Chavez was unable to work in order to be eligible to receive food stamps.  Dr. Paradez agreed to provide the ISD caseworker a statement that Chavez was unable to work while applying for social security disability.  Tr. 154.

On March 29, 2000, Steven I. Sacks, a psychiatrist and agency consultant, evaluated Chavez.  Tr. 136.  Dr. Sacks diagnosed Chavez with major depression, single episode, with a strong element of anxiety.  Dr. Sacks reported a GAF of 65.[1]  A GAF score of 65 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but

---

[1] A Global Assessment of Functioning (GAF score) is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning."  American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders Text Revision (DSM-IV-TR) 30 (4th ed. 2000).  The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal person hygiene, or serious suicidal act with clear expectation of death).  DSM-IV-TR at 32.

generally functioning pretty well, has some meaningful interpersonal relationships."   DSM-IV-TR at 34.  Dr. Sacks opined Chavez would have difficulty withstanding the stress and pressures associated with day to day work activities and relating with others at the present time due to her untreated depression.  Tr. 140, 141.  In addition, Dr. Sacks opined Chavez could (1) understand and follow basic instructions and (2) maintain the attention required to perform simple repetitive and somewhat more complex tasks.  Dr. Sacks considered Chavez' psychiatric impairment to be marked.  Finally, Dr. Sacks noted that Chavez was not involved in any psychotherapy and was not currently on an antidepressant medication.  Tr. 141.

On June 20, 2000, Dr. Scott Brown, an Assistant Professor at the Department of Family and Community Medicine at University Hospital performed a gynecological examination on Chavez.  142-145.  The gynecological examination was normal.  However, Dr. Brown noted Chavez was "significantly disabled" secondary to the musculoskeletal abnormalities of Klippel Feil Syndrome.  According to Dr. Brown, the pain Chavez experienced on a daily basis limited her ability to perform a "meaningful amount of work activity."  Tr. 144.  Chavez also requested counseling and felt she was depressed  but made clear she was not interested in medication for the depression.  Tr. 143.

On July 19, 2000, Dr. Finnegan, a nonexamining agency medical consultant, reviewed the evidence and completed an RFC assessment form and opined Chavez retained the RFC for light work.  Tr. 168-175.  Dr. Finnegan found Chavez had postural limitations and opined Chavez could occasionally climb, balance, stoop, kneel, crouch, and crawl.  Tr. 170.  Dr. Finnegan also found Chavez was limited in her ability to reach, specifically her ability to do overhead work because of the restriction in cervical motion.  Tr. 171.

On April 7, 2000, Dr. Gucker, a psychologist and agency consultant, completed a Psychiatric Review Technique (PTR) form and found Chavez had a marked degree of limitation in social functioning and had "once or twice" had episodes of deterioration or decompensation in work or work-like settings. Tr. 182-191. Dr. Gucker attached a statement to the PRT form. Tr. 183. In his statement, Dr. Gucker cited to Dr. Sacks psychiatric evaluation and noted Chavez chose not to participate in psychiatric treatment or take medication for her depression.

On the same day, Dr. Gucker completed a Mental Residual Functional Capacity (MRFC) Assessment form. Tr. 192-94. Dr. Gucker found Chavez was moderately limited in her ability (1) to understand and remember detailed instructions; (2) to carry out detailed instructions; (3) to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (4) to accept instructions and respond appropriately to criticism from supervisors; and (5) to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. 192, 193. Dr. Gucker further found Chavez was markedly limited in her ability to work in coordination with or in proximity to others without being distracted by them and in her ability to interact appropriately with the general public. Tr. 193.

On April 20, 2000, Dr. Scott Walker, a psychiatrist and agency medical consultant, reviewed the evidence and noted on Chavez' PTR form that her "basic functioning & capacity for SGA unchanged." Tr. 182. On Chavez' MRFC assessment form, Dr. Walker found Chavez' ability to work in coordination with or in proximity to others without being distracted by them was moderate not marked. Tr. 194.

On August 31, 2000, Dr. Madeleine M. Grigg-Damberger, a neurologist at University Hospital, evaluated Chavez at Dr. Paradez' request. Tr. 225-26. Dr. Paradez referred Chavez because of her complaints of "painful eyes" for about two years. Chavez complained her glasses bothered her and requested laser corneal therapy. Dr. Grigg-Damberger evaluated Chavez and ordered an MRI of the lumbosacral spine to the coccyx to rule out a tethered cord. Tr. 225. Dr. Grigg-Damberger instructed Chavez to return in one week after the MRI was done.

On September 25, 2000, Chavez returned for her follow-up with Dr. Grigg-Damberger. Tr. 223. Dr. Grigg-Damberger reviewed the MRI results with Chavez and informed her she did not have a tethered cord. Dr. Grigg-Damberger advised Chavez she could not recommend laser corneal therapy to treat her face pain and recommended she follow-up with her doctor at the eye clinic.

On September 26, 2000, Dr. Grigg-Damberger wrote Dr. Paradez regarding his referral of Chavez. Tr. 220-21. Dr. Grigg-Damberger opined that she could not be of further help to her because Chavez did not want any medications for pain and did not want to wear her contacts, which would improve her pain. Tr. 221.

On January 15, 2001, Chavez returned to University Hospital to the eye outpatient clinic. Tr. 218-19. Chavez complained of painful eye pressure, worse on her left eye. Chavez requested Lasik surgery because she reported her glasses made the pain worse and she couldn't tolerate her contacts for more than four hours. *Id.* The physician evaluated Chavez and referred her to Dr. Vinod Mootha, an opthalmologist at University Hospital, whom she reported she had seen a year ago.

**Residual Functional Capacity Determination**

11

The ALJ found Chavez could perform a wide range of light work.[2]  Tr. 14.  Specifically, the ALJ founds as follows:

> **With consideration having been given to all of the medical records concerning her physical impairment**, I find that Ms. Chavez has the physical residual functional capacity for a wide range of light exertional work; her limitations as to light work would be no overhead reaching or working at unprotected heights.  I find no credible evidence that she does not retain physical capacity to lift and carry 20 pounds occasionally, and 10 pounds frequently.  There are no significant limits on her capacity to stand or walk, and she is able to stand and/or walk for two hour intervals, and for up to six hours during a regular workday.  There is no significant limitation on the use of her upper extremities.

Tr. 13 (emphasis added).  Chavez claims the ALJ's finding that she has the RFC to perform light work is not supported by substantial evidence and is contrary to law.  According to Chavez, Dr. Paradez noted her physical impairments to include "pain in the axial skeleton and a cervical spine fusion, headache and possible central nervous system deficit secondary to increased intracranial pressure."  Tr. 151.  Contrary to this assertion, the record  indicates Dr. Paradez noted the abnormalities associated with Klippel-Feil syndrome in general and not any abnormality specific to Chavez.

Chavez also cites to a nonexamining agency physician's summary of Klippel-Feil syndrome.  Tr. 173.  Along with the summary, the agency physician noted: "She had never had a recommendation to decompress her cervical spine surgically from her orthopedists or neurologists, which would be the treatment for the pain.  It is impossible to ignore her complaints

---

[2]  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, a claimant must have the ability to do substantially all of these activities.  20 C.F.R. §§ 404.1567(b), 416.967(b).

altogether.  Thus, giving credibility to pain, I still feel that can be controlled by avoiding certain activities listed and through judicious use of medication.  She does, however, present a picture of restriction to a 'light level.'"  Tr. 173.

Finally, Chavez cites to Dr. Brown's June 20, 2000 evaluation in support of her claim that she is disabled. Tr. 143-45.  Dr. Brown performed a gynecological examination.  It is unclear what role Dr. Paradez played on this date.  Dr. Brown noted that he had discussed Chavez with Dr. Broyles who agreed with the assessment and plan. Tr. 144.  In his report, Dr. Brown stated Chavez was seeking Social Security disability and informed her "we are not involved in the decision making as far as this is concerned." *Id.*  Additionally, Dr. Brown "agreed that secondary to the musculoskeletal abnormalities, she is significantly disabled, such as the pain she experiences on a daily basis limits her ability to perform a meaningful amount of work activity." *Id.*  Chavez contends the ALJ failed to state what weight he gave Dr. Brown's opinion and why he discounted it.

In his April 26, 2001 Decision, the ALJ noted Chavez had been treated primarily by the University Hospital Neurosurgery Clinic and had been referred to a primary care physician for evaluation of her disability issues. Tr. 12.  In terms of the primary care physicians' evaluation of Chavez' disability issue, the ALJ specifically noted that "Scott Brown, MD, **went only so far as to say** that she was "significantly" disabled, and that her pain limited her ability to perform a meaningful amount of work activity." *Id.*  Citing to the medical evidence, the ALJ summarized Chavez' impairments and pointed out that, although Chavez' primary impairment was due to pain, none of the "multiple orthopedic and neurological specialists" had recommended decompression of the cervical spine, the treatment of choice for the pain.

13

A treating physician may offer an opinion about a claimant's condition and about the nature and severity of any impairments. *Castellano v. Secretary of Health and Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994). The regulations provide that the agency generally will give more weight to medical opinions from treating sources than those from non-treating sources and that the agency will give controlling weight to the medical opinion of a treating source if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2). Moreover, the opinions of specialists related to their area of specialty are entitled to more weight than that of a physician who is not a specialist in the area involved. See 20 C.F.R. § 404.1527(d)(5).

A treating physician's opinion that a claimant is disabled is not dispositive because final responsibility for determining the ultimate issue of disability is reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1), *see also, Castellano*, 26 F.3d at 1029. The record indicates Dr. Brown evaluated Chavez once, and his notes indicate he performed a gynecological examination. Dr. Brown's notes do not reflect that he performed a musculoskeletal or neurological evaluation. Moreover, even if Dr. Brown is considered a treating physician, the evidence does not support his opinion of disability.

The evidence indicates that Chavez had fusion of her cervical spine and mild scoliosis. However, Chavez was neurologically intact, i.e., she had no numbness, tingling, weakness or paresthesias into any of her extremities. She did not have a tethered cord. Dr. Paradez found Chavez' arms and shoulders had normal strength, normal range of motion and normal sensation. He also found her lower extremity strength was normal. None of her physicians limited her ability to stand, walk or sit. She had a normal gait and no problems with her arms or legs. Although she

14

complained of pain, she took her muscle relaxant (Flexeril) every three days, refused pain medication, and disagreed with her physicians' recommendation for neck exercises and physical therapy.   Relying on Dr. Finnegan's RFC assessment form, the ALJ found Chavez retained the RFC for light work with the restriction of no overhead work because of restriction in cervical motion.  This finding is supported by substantial evidence.

**Mental Impairment**

Next, Chavez contends the ALJ improperly evaluated her mental impairment.  The ALJ noted that Dr. Sacks opined that Chavez was experiencing a major depression with a strong element of anxiety and an increasing reclusiveness and avoidance of public contacts.  Tr. 13.  The ALJ relied on Dr. Sacks assessment of Chavez' limitations in terms of her ability to work.  Dr. Sacks' psychiatric evaluation indicated Chavez would have difficulty relating with others at the present time.  Tr. 140.  However, Dr. Sacks was clear that this was due to her untreated depression.  Dr. Sacks also found Chavez "could maintain the attention required to perform simple repetitive and somewhat more complex tasks."  Tr. 141.  Dr. Sacks ultimately concluded Chavez "would have difficulty withstanding the stress and pressures associated with day to day work activities at the present time because of her untreated depression" and considered her psychiatric impairment to be marked.  *Id.*  Dr. Sacks noted that in spite of her difficulties Chavez was "not involved in any psychotherapy and [was] not currently on an antidepressant medication." *Id.*  Dr. Sacks recommended "[h]er response to this would be important to evaluate." *Id.*  Dr. Gucker also noted Chavez chose not to participate in psychiatric treatment and took no medication for depression.  Tr. 183.

15

Failure to follow a prescribed course of treatment, without good reason, is grounds for denial of disability benefits, 20 C.F.R. §§ 404.1530(b) & 416.930(b), and can be the basis for discrediting claimant's subjective complaints. *See Diaz v. Secretary of Health & Human Servs.,* 898 F.2d 774, 777 (10th Cir. 1990).  Sections 404.1530(b) and 416.930(b) requires that a claimant follow prescribed treatment if the treatment can restore his or her ability to work otherwise the agency will find that the claimant is not disabled.

The Tenth Circuit has set out four requirements that must be met before a claimant's failure to undertake treatment will preclude the recovery of disability benefits: (1) the treatment at issue should be expected to restore the claimant's ability to work; (2) the treatment must have been prescribed; (3) the treatment must have been refused; and (4) the refusal must have been without justifiable excuse. *Teter v. Heckler*, 775 F.2d 1104, 1107 (10th Cir. 1985).  The record is replete with references to Chavez refusing treatment for her depression.  Although the ALJ noted in his decision that Chavez was depressed but had not consulted a psychiatrist or therapist, he did not follow the analysis set forth in *Teter*.  Tr. 13.  Accordingly, the Court will remand for further evaluation of this issue as recommended by Dr. Sacks and as set forth in *Teter*.

**NOW, THEREFORE,**

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Reverse and  Remand for a

Rehearing, filed June 19, 2002, is granted.  This matter is remanded to allow the ALJ to further

evaluate Chavez' mental impairment.

A judgment in accordance with this Memorandum Opinion and Order will be entered.


_____

**JOE H. GALVAN**
**UNITED STATES MAGISTRATE JUDGE**